**William OZZELLO and Marlene Ozzello, Plaintiffs,**

v.

**PETERSON BUILDERS, INC., Defendant.**

No. 89–C–85.

United States District Court, E.D. Wisconsin.

Aug. 24, 1990.

Michael Tarnoff, Milwaukee, Wis., for plaintiffs.

Dennis Minichello, Chicago, Ill., for defendant.

## OPINION AND ORDER

CURRAN, District Judge.

On June 18, 1987, William Ozzello fell on a hose aboard the MCM–01, a ship under

**1304**

construction by defendant Peterson Builders, Inc. (PBI). He injured his ankle and claims that the cause was PBI's negligence in failing to maintain a safe workplace. Therefore, he commenced this lawsuit in which he seeks $500,000.00 in compensatory damages. William's wife, Marlene, is seeking $60,000.00 in damages for loss of companionship. The plaintiffs are attempting to sue PBI as the vessel owner pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–50, and have invoked this court's admiralty jurisdiction over the subject matter of their claims. *See* 28 U.S.C. § 1333; Federal Rule of Civil Procedure 9(h). After jurisdiction was challenged, the plaintiffs amended their complaint to allege that this court has an alternate basis for jurisdiction—diversity—because the plaintiffs are both citizens of Michigan; defendant PBI is a Wisconsin corporation with its principal place of business in Wisconsin; and the amount in controversy as to each plaintiff exceeds $50,000.00, exclusive of interest and costs. *See* 28 U.S.C. § 1332.

The defendant has answered and has denied liability. In addition, the defendant has continued to maintain that this court does not have admiralty, maritime, or federal question jurisdiction over the claims and that the plaintiffs are not entitled to relief under the LHWCA.

After the defendant's motion for summary judgment was denied, a trial to the court commenced on May 7, 1990. Following three days of testimony, the trial concluded with closing arguments on May 24, 1990. Having reviewed the testimony, depositions and exhibits received at trial, the court now sets forth its Findings of Fact separately from its Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## I. FINDINGS OF FACT

Prior to trial the parties submitted a statement of uncontested facts. *See* Amended Final Pretrial Report at 1–3.

Where material, these facts have been adopted by the court and incorporated into the court's own findings of facts which were established by a preponderance of the evidence at trial.[1]

### A. DIVERSITY JURISDICTION

1. Plaintiff William Ozzello is a citizen of Iron Mountain, Michigan. *See* Amended Complaint at ¶¶ 1 & 4.

2. Plaintiff Marlene Ozzello is a citizen of Iron Mountain, Michigan. She is the wife of plaintiff William Ozzello. *See* Amended Complaint at ¶¶ 4 & 8.

3. Defendant Peterson Builders, Inc. (PBI) is a Wisconsin corporation having its principal place of business in Sturgeon Bay, Wisconsin. PBI is engaged in the business of ship construction. *See* Amended Final Pretrial Report at (a), ¶ 4; Amended Complaint at ¶ 2.

4. The amount in controversy as to each plaintiff exceeds $50,000.00, exclusive of interest and costs. *See* Amended Complaint at ¶¶ 7 & 9.

### B. LHWCA CAUSES OF ACTION

■ 5. At the time of William Ozzello's injury, Peterson Builders, Inc. was the owner of the MCM–01, a partially constructed minesweeper. *See* Amended Final Pretrial Report at (a), ¶ 6; Memorandum in Response to Order of January 26, 1990 (filed by PBI on February 21, 1990).

6. On June 18, 1987, William Ozzello was injured while working in the course of his employment aboard the MCM–01. *See* Testimony of William Ozzello (May 7, 1990).

7. At the time of William Ozzello's injury, the MCM–01 was afloat on the navigable waters of the United States on Lake Michigan secured to the shipbuilder's dock near Sturgeon Bay, Wisconsin. *See* Amended Complaint at ¶ 5; Defendant's Answer to Amended Complaint at ¶ 5.

---

**1.** Although parties are entitled to require a fact finder to accept stipulations, modifications may be effected by the court if the parties present evidence on those issues at a bench trial. *See* *Frank Music Corporation v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 515 n. 9 (9th Cir. 1985).

8. Prior to and at the time of his injury, William Ozzello was engaged in maritime employment as a shipbuilder. His duties included inspecting and testing winches which had been fabricated and installed aboard ships by his employer, the A.C. Hoyle Company. *See* Testimony of William Ozzello (May 7, 1990); Trial Exhibit 26; Affidavit of William Ozzello at ¶ 3. The fabrication, installation, testing, and inspection of this equipment was called for by the construction contract under which PBI was building the MCM–01. *See* Trial Exhibit 21.

9. The general conduct from which William Ozzello's injury arose was the performance of ship construction work aboard the MCM–01. *See* Testimony of William Ozzello (May 7, 1990); Trial Exhibit 26.

10. William Ozzello's injury did not occur while he or any PBI employees aboard the MCM–01 were performing the work of seamen, or in the course of navigation, or in the course of any conduct affecting maritime commerce.

## C. LIABILITY

11. At all times relevant to this action, defendant Peterson Builders, Inc. was an employer maintaining a place of shipbuilding employment. *See* Amended Final Pretrial Report at (a), ¶ 4; Amended Complaint at ¶ 2.

12. At all times relevant to this action, defendant Peterson Builders, Inc. was the owner of the MCM–01, a ship under construction which was a place of shipbuilding employment. *See* Amended Final Pretrial Report at (a), ¶ 6.

13. At all times relevant to this action, defendant Peterson Builders, Inc. was the general contractor under an agreement to construct the minesweeper MCM–01 for the United States Navy. *See* Trial Exhibit 21.

14. The A.C. Hoyle Company was a subcontractor working under Peterson Builders, Inc.'s agreement to build the MCM–01. *See* Amended Final Pretrial Order at (a), ¶¶ 3, 4 & 5; Trial Exhibit 21.

15. William Ozzello was and is an employee of the A.C. Hoyle Company. *See* Testimony of William Ozzello (May 7, 1990).

16. Around 7:00 A.M. on June 18, 1987, William Ozzello, in the course of his employment with the A.C. Hoyle Company, boarded the MCM–01 to test equipment. *See* Testimony of William Ozzello (May 7, 1990); Exhibit 26.

17. On June 18, 1987, William Ozzello was a frequenter aboard the MCM–01.

18. William Ozzello had been working aboard the MCM–01 for two months prior to June 18, and was familiar with the vessel. *See* Amended Final Pretrial Report at (a), ¶ 6.

19. William Ozzello climbed up onto a piece of equipment to check for a leak. As he stepped up, he noticed no hose beneath his feet. *See* Testimony of William Ozzello (May 7, 1990).

20. After approximately twenty minutes, William Ozzello turned to climb off the equipment to the deck which was approximately four feet below. *See* Testimony of William Ozzello (May 7, 1990).

21. Facing frontward, but without looking down, William Ozzello stepped down. His left foot landed on the nozzle of a hose. *See* Testimony of William Ozzello (May 7, 1990).

22. As he stepped on the nozzle, William Ozzello fell and injured his left ankle. *See* Testimony of William Ozzello (May 7, 1990).

23. The hose had been left on the deck near William Ozzello's work area by unidentified employees of PBI. *See* Testimony of William Ozzello (May 7, 1990).

24. At all times relevant to this action, the hose and the area in which it was placed were under the supervision, custody, and control of defendant Peterson Builders, Inc. *See* Testimony of Calvin Matzke (May 2, 1990).

25. Defendant Peterson Builders, Inc. had constructive notice that its employees had left the hose and its nozzle in a place where it was foreseeable that it could

present a hazard to frequenters working aboard the MCM–01.

26. Pursuant to PBI safety practices, its employees were to keep gear stowed when not in use and areas such as walkways were to be kept cleared of equipment. *See* Testimony of Calvin Matzke (May 8, 1990); Trial Exhibit 27.

27. The area in which William Ozzello was working was marked with yellow tape indicating a restricted work area. *See* Testimony of William Ozzello (May 7, 1990).

28. PBI, through its employees, failed to exercise due care for the safety of William Ozzello when PBI employees left a hose fitted with a nozzle in a place where it could present a hazard to a person climbing off equipment in a restricted work area on the vessel.

29. The conduct of PBI, as described in paragraph 28, above, was a substantial cause of the injury sustained by William Ozzello on June 18, 1987.

30. William Ozzello could have seen the hose had he looked down before descending from the equipment. *See* Testimony of John K. Barto (May 8, 1990).

31. William Ozzello failed to exercise due care for his own safety by failing to look down to determine whether the deck was clear as he began his descent from the equipment above.

32. The conduct of William Ozzello, as described in paragraph 31, above, was a substantial cause of the injury he sustained on June 18, 1987.

33. Assuming the total negligence which caused the injury to William Ozzello on June 18, 1987, to be one hundred percent (100%), the court attributes forty percent (40%) of the total negligence to plaintiff William Ozzello and sixty percent (60%) of the total negligence to defendant Peterson Builders, Inc.

## D. DAMAGES

34. After being injured, William Ozzello was aided by a PBI nurse, then treated at a local hospital. *See* Testimony of William Ozzello (May 7 & 9, 1990); Deposition Testimony of Marilou Jane Bowen (read at trial on May 8, 1990); Amended Final Pretrial Report at (a), ¶ 9.

35. William Ozzello continued medical treatment of his ankle with Donald Jacobs, M.D. *See* Testimony of William Ozzello (May 7 & 9, 1990); Video Deposition Testimony of Donald Jacobs, M.D. (viewed at trial on May 7, 1990); Amended Final Pretrial Report at (a), ¶ 9.

36. Dr. Jacobs referred William Ozzello to the Mayo Clinic in Rochester, Minnesota, where Ozzello was examined five times. *See* Amended Final Pretrial Report at (a), ¶ 9; Trial Exhibit 31.

37. On April 27, 1988, an examining physician at the Mayo Clinic stated that it was his "IMPRESSION" that Ozzello had a "[s]train injury, left foot and ankle, with tibialis [2] posterior dysfunction and possible tibiotalar [3] or talocalcaneal [4] instability." *See* Trial Exhibit 31.

38. Through the time of trial, William Ozzello incurred $7,193.27 in medical and related expenses due to his injury. *See* Amended Final Pretrial Report at (a), ¶ 11; Trial Exhibits 29, 30, 31 & 42.

39. Ozzello did not establish that he will have any medical expenses in the future due to his June 18, 1987, injury.

40. William Ozzello did not return to work from June 18, 1987, the date of his injury, through August 31, 1987, thereby incurring a wage loss of $4,301.44. *See* Testimony of William Ozzello (May 7 & 9,

---

2. **TIBIALIS**: "Tibial: relating to the tibia [shin bone] or to any structure named from it; also denoting the medial or tibial aspect of the lower limb" *Steadman's Medical Dictionary* 1453 (5th ed. 1982).

3. **TIBIO**: "Combining form denoting the tibia [shin bone]." *Steadman's Medical Dictionary,* 1453 (5th ed. 1982).

**TALAR**: "Relating to the talus [ankle bone]." *Steadman's Medical Dictionary,* 1408 (5th ed. 1982).

4. **TALOCALCANEAL**: "Relating to the talus [ankle bone] and the calcaneus [heel bone]." *Steadman's Medical Dictionary* 1408 (5th ed. 1982).

1990); Amended Final Pretrial Report at (a), ¶ 10.

41. Following his return to work in September of 1987, William Ozzello has remained an employee of the A.C. Hoyle Company and has received the same salary and benefits. *See* Testimony of William Ozzello (May 7 & 9, 1990).

42. William Ozzello has failed to establish any future loss of earning capacity due to his injury of June 18, 1987.

43. Following his injury, William Ozzello's employment duties changed. Before his injury, he performed on-site inspections and testing. After his injury, he has been performing sales, set-up and maintenance work at the A.C. Hoyle office. The plaintiff considers his present work less interesting. *See* Testimony of William Ozzello (May 7 & 9, 1990); Deposition Testimony of William Cermak (read at trial on May 8, 1990).

44. Due to his injury, William Ozzello has experienced and will experience instability of his left ankle and foot drop. *See* Video Deposition Testimony of Donald Jacobs, M.D. (viewed at trial on May 7, 1990).

45. William Ozzello wears a brace on his left ankle which makes climbing, bending or being on his feet for long periods of time difficult. *See* Testimony of William Ozzello (May 7 & 9, 1990); Testimony of Marlene Ozzello (May 8, 1990).

46. Following his injury, William Ozzello has had to curtail recreational activities he formerly enjoyed such as hunting, fishing and gardening. *See* Testimony of William Ozzello (May 7 & 9, 1990); Testimony of Marlene Ozzello (May 8, 1990).

47. William Ozzello was born on June 21, 1932. At the time of trial he had a life expectancy of 19.9 years. *See* Amended Final Pretrial Report at (a), ¶ 1.

48. Since June 18, 1987, William Ozzello has experienced pain and suffering due to his injury, and he will continue to experience pain and suffering in the future. *See* Testimony of William Ozzello (May 7 & 9, 1990); Video Deposition Testimony of Donald Jacobs, M.D. (viewed at trial on May 7,

1990); Testimony of Marlene Ozzello (May 8, 1990).

49. The monetary amount which will compensate William Ozzello for medical and related expenses through the date of trial is $7,193.27.

50. The monetary amount which will compensate William Ozzello for past wage loss is $4,301.44.

51. The monetary amount which will compensate William Ozzello for past pain and suffering through the date of judgment is $29,250.00.

52. The monetary amount which will compensate William Ozzello for future pain and suffering is $108,000.00.

53. Following his injury, William Ozzello has had to curtail assisting his wife with household and yard maintenance chores and participating in some social activities such as dancing. *See* Testimony of William Ozzello (May 7 & 9, 1990); Testimony of Marlene Ozzello (May 8, 1990).

54. The monetary amount which will compensate Marlene Ozzello for the loss of the society, companionship and services of her husband, William Ozzello, due to his June 18, 1987 injury is $5,000.00.

## II. CONCLUSIONS OF LAW

### A. DIVERSITY JURISDICTION

1. This court has jurisdiction over the subject matter of the plaintiffs' claims pursuant to 28 U.S.C. § 1332, which provides, in relevant part, that:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

. . . .

### B. LHWCA CAUSES OF ACTION

2. Subsection 905(b) of the Longshore and Harbor Workers' Compensation Act provides that:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person,

or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole, or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b).

3. Under the LHWCA, an injured employee may bring an action for damages against a "vessel," which is defined as follows:

Unless the context requires otherwise, the term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.

33 U.S.C. § 902(21).

4. On June 18, 1987, defendant Peterson Builders, Inc., the owner of the MCM–

01, was a "vessel" as defined by subsection 902(21) of the LHWCA.

5. For the LHWCA to apply, the injured person must be injured in the course of his employment; the injury must occur upon the navigable waters of the United States; and the employee who is injured must be a person engaged in maritime employment. *See Chesapeake and Ohio Railway Company v. Schwalb*, —— U.S. ——, 110 S.Ct. 381, 384, 107 L.Ed.2d 278 (1989).

6. Under the LHWCA:

The term "injury" means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment.

33 U.S.C. § 902(2).

7. On June 18, 1987, plaintiff William Ozzello suffered an "injury" as defined by section 902(2) of the LHWCA.

8. In order to bring a claim under section 905 of the LHWCA, the plaintiff must meet the statutory situs requirement. *See Chesapeake and Ohio Railway Company v. Schwalb*, —— U.S. ——, 110 S.Ct. 381, 384, 107 L.Ed.2d 278 (1989). The Act provides that:

Except as otherwise provided in this section, compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a).

9. Plaintiff William Ozzello's June 18, 1987 injury occurred on "navigable waters" as defined by subsection 903(a) of the LHWCA.

10. In order to bring a claim under section 905 of the LHWCA, an injured party must meet the statutory status requirement. *See Chesapeake and Ohio Railway Company v. Schwalb,* — U.S. ——, 110 S.Ct. 381, 384, 107 L.Ed.2d 278 (1989). The LHWCA provides the following definition of an "employee" covered by the Act:

The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include—

(A) individuals employed exclusively to perform office clerical, secretarial, security, or data processing work;

(B) individuals employed by a club, camp, recreational operation, restaurant, museum, or retail outlet;

(C) individuals employed by a marina and who are not engaged in construction, replacement, or expansion of such marina (except for routine maintenance);

(D) individuals who (i) are employed by suppliers, transporters, or vendors, (ii) are temporarily doing business on the premises of an employer described in paragraph (4), and (iii) are not engaged in work normally performed by employees of that employer under this chapter;

(E) aquaculture workers;

(F) individuals employed to build, repair, or dismantle any recreational vessel under sixty-five feet in length;

(G) a master or member of a crew of any vessel; or

(H) any person engaged by a master to load or unload or repair any small vessel under eighteen tons net;

if individuals described in clauses (A) through (F) are subject to coverage under a State workers' compensation law.

33 U.S.C. § 902(3).

11. Whether an employee is a shipbuilder under subsection 902(3) of the LHWCA is determined by applying a functional relationship test. This court must determine whether the employee's functions were an integral part of the new ship construction activities. *See Dravo Corporation v. Maxin,* 545 F.2d 374, 379–80 (3d Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).

12. On June 18, 1987, plaintiff William Ozzello was employed as a "shipbuilder" as that term is used in the LHWCA. *See Hall v. Hvide Hull No. 3,* 798 F.2d 122, 123 (5th Cir.1986) *(per curiam), cert. denied sub nom. Rosetti v. Avondale Shipyards, Inc.,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

13. On June 18, 1987, plaintiff William Ozzello was an "employee" engaged in "maritime employment" as defined by subsection 902(3) of the LHWCA.

14. In order to be cognizable under subsection 905(b) of the LHWCA, a tort must occur on or in navigable waters and there must be a substantial relationship between the activity giving rise to the incident and traditional maritime activity. *See Richendollar v. Diamond M Drilling Company, Inc.,* 819 F.2d 124, 125 (5th Cir.) *(en banc), cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987); *Drake v. Raymark Industries, Inc.,* 772 F.2d 1007, 1014–15 (1st Cir.1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986). *See also Molett v. Penrod Drilling Company,* 872 F.2d 1221, 1224–25 (5th Cir.) *(per curiam), cert. denied sub nom. Columbus–McKinnon, Inc. v. Gearench, Inc.,* — U.S. ——, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989).

15. The test to determine the existence of a cause of action in maritime tort under subsection 905(b) of the LHWCA is identical with that applied to determine jurisdiction in admiralty. *May v. Transworld Drilling Company,* 786 F.2d 1261, 1265 (5th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986).

16. A party asserting admiralty jurisdiction must show that the tort occurred on or in navigable waters and that the tort bears a significant relationship to traditional maritime activity. *See Sisson v. Ruby,* —

U.S. ——, 110 S.Ct. 2892, 2985, 111 L.Ed.2d 292 (1990); *Foremost Insurance Company v. Richardson*, 457 U.S. 668, 673, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300821282817212 7225

17. For purposes of determining whether a tort bears a significant relationship to traditional maritime activity, the relevant activity "is defined not by the particular circumstances of an incident, but by the general conduct from which the incident arose." *Sisson v. Ruby*, —— U.S. ——, 110 S.Ct. 2892, 2897, 111 L.Ed.2d 292 (1990).

18. Shipbuilding is not a traditional maritime activity. *See Owens–Illinois, Inc. v. United States District Court*, 698 F.2d 967, 971 (9th Cir.1983); *People's Ferry Company of Boston v. Beers*, 61 (20 How.) U.S. 393, 15 L.Ed. 961 (1858).

19. Factors to be considered in determining whether an injury has occurred in furtherance of an activity bearing a substantial relationship to a traditional maritime activity include: (1) whether the injury occurred in the course of maritime service; (2) whether the injury occurred in the course of navigation; (3) whether the injury occurred in the course of promoting maritime commerce or whether it presented a hazard to maritime commerce; and, (4) whether the conduct surrounding the injury gives rise to the need for the application of admiralty law, particularly the uniform "rules of the road" governing navigation. *See Sisson v. Ruby*, —— U.S. ——, 110 S.Ct. 2892, 2898, 111 L.Ed.2d 292 (1990); *Foremost Insurance Company v. Richardson*, 457 U.S. 668, 672–77, 102 S.Ct. 2654, 2656–59, 73 L.Ed.2d 300 (1982); *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253–74, 93 S.Ct. 493, 497–507, 34 L.Ed.2d 454 (1972).

20. Having found that William Ozzello was engaged in the activity of ship construction and was testing and inspecting winches at the time he stumbled on a hose nozzle and was injured and that the hose nozzle was a piece of equipment which was in the custody and control of defendant Peterson Builders, Inc. which was also en-

gaged in the activity of ship construction, the court concludes that the activity giving rise to Ozzello's June 18, 1987 injury bore no substantial relationship to traditional maritime activity.

21. Because plaintiffs William and Marlene Ozzello have not established the nexus element of admiralty tort jurisdiction, they cannot maintain a negligence claim pursuant to 33 U.S.C. § 905(b) against defendant Peterson Builders, Inc., the owner and operator of the MCM–01.

## C. LIABILITY

22. The Wisconsin Safe Place Statute provides, in relevant part that:

(1) Every employer shall furnish employment which shall be safe to the employes therein and shall furnish a place of employment which shall be safe for employes therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employes and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

(2)(a) No employer shall require, permit or suffer any employe to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide and use safety devices and safeguards, or fail to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and no such employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health, safety or welfare of such employes and frequenters; and no employer or owner, or other person shall hereafter construct or occupy or maintain any place of employ-

ment, or public building, that is not safe, nor prepare plans which shall fail to provide for making the same safe. Wis.Stat. § 101.11(1) & (2)(a).

23. Under the Wisconsin Safe Place Statute, an "employer" is defined as: "every person, firm, corporation, state, county, town, city, village, school district, sewer district, drainage district and other public or quasi-public corporations as well as any agent, manager, representative or other person having control or custody of any employment, place of employment or of any employe." Wis.Stat. § 101.01(2)(b).

■ 24. On June 18, 1987, defendant Peterson Builders, Inc. was an "employer" as defined by subsection 101.01(2)(b) of the Wisconsin Safe Place Statute.

25. Under the Wisconsin Safe Place Statute:

The term "employment" shall mean and include any trade, occupation or process of manufacture, or any method of carrying on such trade, occupation or process of manufacture in which any person may be engaged, except in such private domestic service as does not involve the use of mechanical power and in farm labor....

Wis.Stat. § 101.01(2)(c).

26. Under the Wisconsin Safe Place Statute:

"Place of employment" includes every place, whether indoors or out or underground and the premises appurtenant thereto where either temporarily or permanently any industry, trade or business is carried on, or where any process or operation, directly or indirectly related to any industry, trade or business, is carried on, and where any person is, directly or indirectly, employed by another for direct or indirect gain or profit, but does not include any place where persons are employed in private domestic service which does not involve the use of mechanical power or in farming....

Wis.Stat. § 101.01(2)(f).

■ 27. On June 18, 1987, the MCM–01 was a "place of employment" as defined by subsection 101.01(2)(f) of the Wisconsin Safe Place Statute.

28. Under the Wisconsin Safe Place Statute:

The term "safe" or "safety" as applied to an employment or a place of employment or a public building, shall mean such freedom from danger to the life, health, safety or welfare of employes or frequenters, or the public, or tenants, or fire fighters, and such reasonable means of notification, egress and escape in case of fire, and such freedom from danger to adjacent buildings or other property, as the nature of the employment, place of employment, or public building, will reasonably permit.

Wis.Stat. § 101.01(2)(h).

29. Under the Wisconsin Safe Place Statute:

"Frequenter" means every person other than an employe, who may go in or be in a place of employment or public building under circumstances which render such person other than a trespasser....

Wis.Stat. § 101.01(2)(d).

■ 30. An employee of a subcontractor is a frequenter of the place of employment of the general contractor. *See Barth v. Downey Company*, 71 Wis.2d 775, 778–79, 239 N.W.2d 92, 93–94 (1976).

■ 31. When plaintiff William Ozzello was aboard the MCM–01 on June 18, 1987, he was a "frequenter" as that term is defined by subsection 101.01(2)(d) of the Wisconsin Safe Place Statute.

32. Under the Wisconsin Safe Place Statute:

The term "owner" shall mean and include every person, firm, corporation, state, county, town, city, village, school district, sewer district, drainage district and other public or quasi-public corporations as well as any manager, representative, officer, or other person having ownership, control or custody of any place of employment or public building, or of the construction, repair or maintenance of any place of employment or public building, or who prepares plans for the construction of any place of employment or

public building. Said ss. 101.01 to 101.25 shall apply, so far as consistent, to all architects and builders.

Wis.Stat. § 101.01(2)(e).

33. On June 18, 1987, defendant Peterson Builders, Inc. was the "owner" of a place of employment as the term "owner" is defined in subsection 101.01(2)(e) of the Wisconsin Safe Place Statute.

■ 34. Plaintiffs alleging a violation of the Wisconsin Safe Place Statute have the burden of proving all elements of negligence by a preponderance of the evidence. *See Paluch v. Baldwin Plywood & Veneer Company*, 1 Wis.2d 427, 432, 85 N.W.2d 373, 376 (1957).

■ 35. The defendant has the burden of proving contributory negligence by a preponderance of the evidence. *See Helmbrecht v. St. Paul Insurance Company*, 122 Wis.2d 94, 121, 362 N.W.2d 118, 132 (1985).

36. To constitute a cause of action for negligence, there must be: (1) a duty to conform to a certain standard of conduct to protect others against an unreasonable risk of harm; (2) a failure to conform to the required standard; (3) a causal connection between the conduct and the injury; and (4) actual loss or damage as a result of the injury. *See Robinson v. Mt. Sinai Medical Center*, 137 Wis.2d 1, 15, 402 N.W.2d 711, 716 (1987); *Hamed v. Milwaukee County*, 108 Wis.2d 257, 266–67, 321 N.W.2d 199, 204 (1982); *Thomas v. Kells*, 53 Wis.2d 141, 144, 191 N.W.2d 872, 873 (1971).

37. To establish tort liability, the plaintiffs must prove the existence of a legal duty owed to them by the defendant. *See Bogust v. Iverson*, 10 Wis.2d 129, 132, 102 N.W.2d 228, 229 (1960).

38. Under the Wisconsin Safe Place Statute, an owner or general contractor can owe a duty to the employee of a subcontractor as a "frequenter". *See* Wis.Stat. § 101.11; *Lemacher v. Circle Construction Company*, 72 Wis.2d 245, 249, 240 N.W.2d 179, 181 (1974).

■ 39. Under the Wisconsin Safe Place Statute, an employer or owner is not required to guarantee the safety of a frequenter, but must maintain a place of employment as safe as the nature of the place reasonably permits. *See Zehren v. F.W. Woolworth Company*, 11 Wis.2d 539, 543, 105 N.W.2d 563, 565 (1960). The Safe Place Statute establishes a higher standard of care than ordinary negligence at common law. *See Id.*

■ 40. A general contractor who sublets all or part of a contract to a subcontractor has a duty not to commit an affirmative act which would increase the risk of injury to an employee of the subcontractor. An affirmative act is an act of commission—that is, something that one does—as opposed to an act of omission, which is something one fails to do. *See* Wisconsin Jury Instructions—Civil 1022.2; *Wagner v. Continental Casualty Company*, 143 Wis.2d 379, 381–82, 421 N.W.2d 835, 836 (1988); *Lemacher v. Circle Construction Company*, 72 Wis.2d 245, 248–49, 240 N.W.2d 179, 180–81 (1976).

■ 41. Before an employer or owner has a duty to furnish a safe place of employment, such employer or owner must have the right to control the place so that it can perform its duty to furnish a safe place of employment. This control of the premises need not be exclusive, nor is it necessary to have control for all purposes in order to impose a duty to furnish a safe place of employment. The duty of a general contractor to furnish a safe place of employment for an employee of a subcontractor extends only to such use as the general contractor or its employees made of the premises and the effect produced thereon by its own work, materials, and equipment within its supervision and control. *See* Wisconsin Jury Instructions—Civil 1911; *Lemacher v. Circle Construction Company*, 72 Wis.2d 245, 249, 240 N.W.2d 179, 181 (1976).

■ 42. In order for an employer or an owner to be liable for an unsafe condition, it must have actual or constructive notice of it. *See Strack v. Great Atlantic & Pacific Tea Company*, 35 Wis.2d 51, 54, 150 N.W.2d 361, 362 (1967). However, when an unsafe condition, although tempo-

rary, arises out of the course of conduct of the owner or operator of a premises or may reasonably be expected to arise from its method of operation, a much shorter period of time, and possibly no appreciable period of time under some circumstances, need exist to constitute constructive notice. *See May v. Skelley Oil Company,* 83 Wis.2d 30, 37 n. 7, 264 N.W.2d 574, 577 n. 7 (1978).

■■■ 43. Evidence of custom can be considered in determining whether an employer or owner kept a place of employment as safe as the nature of the premises reasonably permitted. *See* Wisconsin Jury Instructions—Civil 1019; *Victorson v. Milwaukee & Suburban Transport Corporation,* 70 Wis.2d 336, 351–52, 234 N.W.2d 332, 339–40 (1975).

44. Although a frequenter is protected by the safe place law, he still has the duty to exercise reasonable care for his own safety, and if he fails to do so, he is guilty of contributory negligence. *See Sachse v. Mayer,* 18 Wis.2d 457, 463, 118 N.W.2d 914, 917 (1963).

■■■ 45. A frequenter has a duty to use ordinary care for his own safety and protection and to observe the immediate surroundings and all other conditions surrounding him, and the dangers, if any, which are open and obvious to him, and to use for his own safety all such care and caution as the ordinarily prudent person ordinarily uses under like circumstances. However, a frequenter is not bound absolutely by law to see every hazard or danger, if any exists in his pathway, even should such a hazard be plainly observable. He is only required to act as a reasonably prudent person under the same circumstances would act. *See* Wisconsin Jury Instructions—Civil 1902. *See also Steinhorst v. H.C. Prange Company,* 48 Wis.2d 679, 680, 180 N.W.2d 525, 525 (1970); *Carlson v. Drews of Hales Corners, Inc.,* 48 Wis.2d 408, 412–16, 180 N.W.2d 546, 548–50 (1970).

46. Preoccupation of a worker in the performance of his work minimizes or reduces the degree of care that would otherwise be required of him; nevertheless, a worker has the duty to use the same degree of care for his own safety that an ordinarily prudent worker would use under such conditions when preoccupied with his work. *See* Wisconsin Jury Instructions—Civil 1051; *Suhaysik v. Milwaukee Cheese Company,* 132 Wis.2d 289, 295–98, 392 N.W.2d 98, 100–02 (1986).

47. Whether a duty exists under the facts and circumstances of a particular case is a question of law. *See Johnson v. Misericordia Community Hospital,* 97 Wis.2d 521, 542–43, 294 N.W.2d 501, 513 (Ct.App.1980), *aff'd,* 99 Wis.2d 708, 301 N.W.2d 156 (1981).

48. Under the facts and circumstances of this case, defendant Peterson Builders, Inc. had a legal duty to maintain a safe place of employment for a frequenter such as plaintiff William Ozzello.

49. Under the facts and circumstances of this case, plaintiff William Ozzello had a legal duty to exercise ordinary care for his own safety.

50. Defendant Peterson Builders, Inc. was negligent in breaching its duty to William Ozzello, a frequenter on premises under its supervision and control, to keep its walkways and work areas cleared of hazards and obstructions.

51. Plaintiff William Ozzello was negligent in breaching his legal duty to exercise ordinary care for his own safety when he failed to check the area beneath his feet as he climbed down to the deck of the MCM–01.

52. Legal cause is made up of two components: cause-in-fact and proximate cause. *See Johnson v. Misericordia Community Hospital,* 97 Wis.2d 521, 560 n. 20, 294 N.W.2d 501, 521 n. 20 (Ct.App.1980), *aff'd,* 99 Wis.2d 708, 301 N.W.2d 156 (1981).

53. The test of cause-in-fact is whether the defendant's negligence was a substantial factor in contributing to the harm from which damages are claimed. The phrase "substantial factor" indicates the effect of the defendant's harm in leading the trier of fact, acting as the reasonable person, to regard it as a "cause," using the word "cause" in its popular sense. *See Johnson*

v. *Misericordia Community Hospital*, 97 Wis.2d 521, 560, 294 N.W.2d 501, 520 (Ct. App.1980), *aff'd*, 99 Wis.2d 708, 301 N.W.2d 156 (1981).

54. There may be more than one substantial cause in any given case. *See Merco Distributing Corporation v. Commercial Police Alarm Company, Inc.*, 84 Wis.2d 455, 459, 267 N.W.2d 652, 655 (1978).

55. Negligence is a proximate cause of an injury when it appears that the injury was the natural and probable consequence of the negligence or wrongful act, and that the injury ought to have been foreseen. Public policy considerations which may preclude liability even when negligence is present are an element of legal cause, though not a part of the determination of cause-in-fact. *See Morgan v. Pennsylvania General Insurance Company*, 87 Wis.2d 723, 737, 275 N.W.2d 660, 667 (1979).

56. Defendant Peterson Builders, Inc.'s negligence was a proximate cause of the injury sustained by William Ozzello on June 18, 1987. Having found that PBI's acts of negligence were also a cause-in-fact of William Ozzello's injury, the court concludes that PBI's negligence was a legal cause of William Ozzello's injury.

57. Plaintiff William Ozzello's negligence was a proximate cause of his own injury on June 18, 1987. Having found that William Ozzello's acts of negligence were also a cause-in-fact of his own injury, the court concludes that William Ozzello's negligence was a legal cause of his own injury.

58. Under the comparative negligence doctrine, when more than one substantial factor contributes to an injury, the contribution of all factors must be considered and determined in terms of percentages of total cause. *See Sampson v. Laskin*, 66 Wis.2d 318, 325–26, 224 N.W.2d 594, 597–98 (1975).

59. Contributory negligence is not a complete defense unless the victim's negligence is greater than the injurer's. *See* Wis.Stat. § 895.045. *See also Orthmann*

v. *Apple River Campground, Inc.*, 757 F.2d 909, 913 (7th Cir.1985).

### D. DAMAGES

60. The injury suffered by plaintiff William Ozzello is legally compensable by money damages.

61. A plaintiff may recover a sum of money that will fairly and reasonably compensate him for the damages sustained by him from the date of the accident to the date of trial, which were the result of the accident, with respect to medical and hospital expenses. This amount need not be limited to doctor and hospital bills. The plaintiff is entitled to recover, as a part of these expenses, such an amount as will reasonably compensate him for costs of transportation from his home to the places of treatment and return. *See* Wisconsin Jury Instructions—Civil 1750A(1). *See also Thoreson v. Milwaukee & Suburban Transport Company*, 56 Wis.2d 231, 243, 201 N.W.2d 745, 751 (1972).

62. A plaintiff may recover a sum of money which will fairly and reasonably compensate him for the damages sustained by him from the date of the accident to the date of trial, which were the result of the accident, with respect to wage loss. *See* Wisconsin Jury Instructions—Civil 1750A(3). *See also Burlison v. Janssen*, 30 Wis.2d 495, 503, 141 N.W.2d 274, 278 (1966).

63. A plaintiff may recover a sum of money which will fairly and reasonably compensate him for such pain and suffering and such impairment of his health, physical abilities, and bodily functions as he has suffered to date and is reasonably certain to suffer in the future as a consequence of his injury. In arriving at this sum, a court may consider the humiliation, embarrassment, worry, and mental distress, if any, which the plaintiff has endured in the past and is reasonably certain to endure in the future. The court may also consider to what extent the plaintiff's injuries have impaired and will impair his ability to enjoy the normal activities, pleasures, and benefits of life, the nature of his injuries, the effect produced thereby in the

past, and the effect it is reasonably certain such injuries will produce in the future. The court may bear in mind the plaintiff's age, his prior physical condition, and the probable duration of his life. Pain and suffering cannot be computed with mathematical precision. *See* Wisconsin Jury Instructions—Civil 1750A(5). *See also Johnson v. Misericordia Community Hospital,* 97 Wis.2d 521, 566–75, 294 N.W.2d 501, 523–28 (Ct.App.1980), *aff'd,* 99 Wis.2d 708, 301 N.W.2d 156 (1981).

64. An injured plaintiff's spouse may recover a sum of money that will fairly and reasonably compensate her for loss of consortium. Consortium involves the love and affection, the companionship and society, the comfort, aid, advice and solace, the rendering of material services, and any other elements that normally arise in a close, intimate, and harmonious marriage relationship. A wrongful invasion, impairment, or deprivation of any of these rights, resulting from a disabling injury to a spouse, is a legal loss and a basis for damages to the other spouse harmed or deprived.

A court can consider the nature, the form, and quality of the relationship that existed between the spouses up to the time of the injury. If the loss will continue in the future, damages may be included for the period the loss will continue to exist. Compensation for loss of consortium, except as it relates to material services, is not measured by any rule of market value. Instead, it is measured on the basis of what is fair and reasonable compensation for the loss sustained by the deprived spouse. *See* Wisconsin Jury Instructions—Civil 1815.

## III. DISCUSSION

### A. JURISDICTION

The plaintiffs' original complaint alleged that: "jurisdiction of this court over this action is invoked pursuant to Sec. 33 USCS, Sec. 901 et seq. known as the Longshoremens' [sic] and Harbor Workers' Compensation Act; this is an admiralty or maritime claim within the meaning of Rule 9(h)." Complaint at ¶ 3. As a threshold matter, the Longshore and Harbor Workers Compensation Act itself provides no independent basis of jurisdiction. *See Lowe v. Ingalls Shipbuilding, a Division of Litton Systems, Inc.,* 723 F.2d 1173, 1177 n. 1 (5th Cir.1984). Moreover, attempting to state a claim under section 905(b) of the LHWCA, as the Ozzellos have done, does not automatically confer admiralty or federal question jurisdiction. *See Drake v. Raymark Industries, Inc.,* 772 F.2d 1007, 1011–19 (1st Cir.1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986).

In general, a plaintiff with an admiralty or maritime claim has three alternatives: to bring an admiralty suit in federal court, invoking the court's exclusive admiralty jurisdiction under 28 U.S.C. § 1333; to bring a suit at law in state court under the "saving to suitors" clause; or to bring a maritime action on the law side of a federal court. *Neal v. McGinnis, Inc.,* 716 F.Supp. 996, 998 (E.D.Ky.1989). When PBI challenged the admiralty basis for subject matter jurisdiction in this case, the plaintiffs filed an amended complaint alleging that this court also has diversity jurisdiction over their claims. *See* Amended Complaint at ¶ 4. There is no dispute that the plaintiffs and the defendant are citizens of different states and that the amount in controversy as to each plaintiff exceeds $50,000.00. Consequently, the court has concluded that it has diversity jurisdiction over the subject matter of these claims, and believes that, initially, it is unnecessary to decide whether it also has admiralty jurisdiction.[5]

---

5. As will be discussed in the following section, other circuits have held that a party cannot maintain a tort claim under section 905(b) of the LHWCA unless the party can also establish federal maritime or admiralty jurisdiction. *See, e.g., Molett v. Penrod Drilling Company,* 872 F.2d 1221 (5th Cir.) (*per curiam*), *cert. denied sub* *nom. Columbus–McKinnon, Inc. v. Gearench, Inc.,* — U.S. ——, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). Thus, the court will consider the elements of admiralty jurisdiction when it considers the issue of whether the plaintiffs have viable claims under the LHWCA.

## B. LHWCA CAUSES OF ACTION

After William Ozzello was injured, he filed a claim for benefits under the Longshore and Harbor Workers' Compensation Act with the United States Department of Labor's Office of Workers' Compensation Programs. *See* 33 U.S.C. §§ 903 & 904. Benefits were granted for a period extending from June 20, 1987, through September 2, 1987. In addition, a deputy commissioner from the Office of Workers' Compensation Programs sent Ozzello a letter encouraging him to file a lawsuit against a "third party (other than your employer)." *See* Letter of Deputy Commissioner J. Hubert Doerr to Attorney John L. Mouw (dated July 26, 1989). Accordingly, the plaintiffs filed this lawsuit alleging that Peterson Builders, Inc. is liable to them under section 905(b) of the LHWCA for the negligence of the vessel MCM–01. *See* 33 U.S.C. § 905(b). Under section 905(b), certain covered employees [6] can sue a vessel [7] for damages due to injuries caused by the negligence of the vessel. PBI has steadfastly maintained that any claims the plaintiffs might have do not arise under section 905(b) because Ozzello is not a covered employee and because the MCM–01 had not achieved vessel status at the time of the injury.

### 1. *Statutory Requirements*

As a requisite to maintaining an action pursuant to section 905, an injured person must establish that he meets the statutory "situs" and "status" requirements. *See Chesapeake and Ohio Railway Company v. Schwalb,* —— U.S. ——, 110 S.Ct. 381, 384, 107 L.Ed.2d 278 (1989). First, the injury must have occurred on the navigable waters [8] of the United States. Second, the plaintiff must have engaged in maritime employment.[9]

In this case the parties agree that William Ozzello's injury occurred aboard the MCM–01 when it was afloat upon the navigable waters of Lake Michigan near Sturgeon Bay, Wisconsin. *See* Complaint at

---

**6.** The LHWCA provides the following definition of an "employee" covered by the Act:

The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include—
(A) individuals employed exclusively to perform office clerical, secretarial, security, or data processing work;
(B) individuals employed by a club, camp, recreational operation, restaurant, museum, or retail outlet;
(C) individuals employed by a marina and who are not engaged in construction, replacement, or expansion of such marina (except for routine maintenance);
(D) individuals who (i) are employed by suppliers, transporters, or vendors, (ii) are temporarily doing business on the premises of an employer described in paragraph (4), and (iii) are not engaged in work normally performed by employees of that employer under this chapter;
(E) aquaculture workers;
(F) individuals employed to build, repair, or dismantle any recreational vessel under sixty-five feet in length;
(G) a master or member of a crew of any vessel; or
(H) any person engaged by a master to load or unload or repair any small vessel under eighteen tons net;

if individuals described in clauses (A) through (F) are subject to coverage under a State workers' compensation law.
33 U.S.C. § 902(3).

**7.** The LHWCA does not define "vessel," but merely provides that:

Unless the context requires otherwise, the term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.
33 U.S.C. § 902(21).

**8.** The LHWCA provides that:

Except as otherwise provided in this section, compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).
33 U.S.C. § 903(a).

**9.** *See* 33 U.S.C. § 902(3).

¶ 5; Defendant's Answer to Amended Complaint at ¶ 5. Therefore, his injury meets the locality test. However, PBI does not concede that Ozzello meets the "status," test. The defendant contends that Ozzello was working as a "vendor" or "supplier"—two categories of employees which are specifically excluded from coverage. *See* 33 U.S.C. § 902(3)(D). The plaintiffs, on the other hand, maintain that William Ozzello was a shipbuilder and point out that a shipbuilder is specifically included in the statutory definition of "employee" in the LHWCA. *See* 33 U.S.C. § 902(3).

At trial, William Ozzello testified that a large part of his employment functions with A.C. Hoyle entailed testing and inspecting equipment aboard ships under construction.[10] At the time of his fall, he was aboard the MCM–01 to test winches that had been fabricated and installed by Hoyle. *See* Trial Exhibit 26. This equipment was called for by the construction contract under which PBI was building the ship and its purpose was to equip the ship for navigating and for its intended special military use. *See* Trial Exhibit 21. Based upon these facts, the court will assume that William Ozzello was a shipbuilder for purposes of the LHWCA. *See Hall v. Hvide Hull No. 3*, 798 F.2d 122, 123 (5th Cir.1986) (*per curiam*), *cert. denied sub nom. Rosetti v. Avondale Shipyards, Inc.*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Alford v. American Bridge Division, United States Steel Corporation*, 655 F.2d 86, 87 (5th Cir.1981) (*per curiam*), *cert. denied*, 455 U.S. 927, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982); *Dravo Corporation v. Maxin*, 545 F.2d 374, 380 (3d Cir.1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).

### 2. *Admiralty Jurisdiction*

#### a. Supreme Court Precedent

With the situs and status requisites met, the question becomes whether the subject matter of the plaintiffs' claims must also meet the United States Supreme Court's test for admiralty tort jurisdiction. Traditionally, a court could exercise admiralty jurisdiction over a claim arising from any tort which occurred on navigable waters. *See, e.g., The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851). However, in 1972, the Court modified this traditional test. In *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), a plane had lost power shortly after takeoff. The plane descended, missed the runway, and settled into Lake Erie. When the resulting suit for property damage reached the United States Supreme Court, Justice Stewart, writing for a unanimous Court, decided that the fact that the aircraft had gone down on navigable waters was not sufficient to invoke admiralty jurisdiction. Reasoning that the locality test "was established and grew up in an era when it was difficult to conceive of a tortious occurrence on navigable waters other than in connection with a waterborne vessel," *id.* at 254, 93 S.Ct. at 497, the Court held that in the context of aviation torts, "a significant relationship to traditional maritime activity" must be shown before admiralty jurisdiction can be invoked. *Id.* at 268, 93 S.Ct. at 504.

A decade later, the Court indicated that the *Executive Jet* test applies in non-aviation contexts. *Foremost Insurance Company v. Richardson*, 457 U.S. 668, 673, 102 S.Ct. 2654, 2657, 73 L.Ed.2d 300 (1982), was an action to recover for the death of an occupant of a pleasure boat resulting from a collision with another pleasure boat on a river in Louisiana. Even though neither boat was involved in maritime commerce, the Court held that:

> In light of the need for uniform rules governing navigation, the potential impact on maritime commerce when two vessels collide on navigable waters, and the uncertainty and confusion that would necessarily accompany a jurisdictional test tied to the commercial use of a given boat, we hold that a complaint alleging a collision between two vessels on naviga-

---

**10.** In his Mayo Clinic records, the plaintiff is described as a "crane inspector" whose job "involves supervisory and inspection type work on high construction cranes...." Trial Exhibit 31 at entry for April 8, 1988.

ble waters properly states a claim within the admiralty jurisdiction of the federal courts.

*Id.* at 677, 102 S.Ct. at 2659.

Following *Foremost,* several of the circuits concluded that a plaintiff must be able to meet the *Executive Jet* test for admiralty jurisdiction in order to maintain any maritime tort claim, including one brought pursuant to section 905(b) of the LHWCA. *See, e.g., May v. Transworld Drilling Company,* 786 F.2d 1261 (5th. Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986). Courts impose this requirement regardless of the actual basis of jurisdiction, such as diversity, *see May,* 786 F.2d at 1264; *Drake v. Raymark Industries, Inc.,* 772 F.2d 1007, 1012 (1st Cir.1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986), and regardless of whether the action is commenced in state or federal court, *see, e.g., Orgeron v. Avondale Shipyards,* 561 So.2d 38 (La.1990), *petition for cert. filed,* 59 U.S.L.W. 3004 (U.S. June 6, 1990) (No. 89–1896).

### b. Shipbuilder Claims

Just two months before the Supreme Court restricted the reach of admiralty jurisdiction in *Executive Jet,* the 1972 amendments to the LHWCA went into effect. One of these amendments specifically included "shipbuilders" within the statutory definition of "employee." *See* Pub.L. 92–576, § 18(a), October 27, 1972, 86 Stat. 1263.

In the wake of this amendment and *Executive Jet,* numerous cases reached the federal courts in which land-based shipbuilders attempted to sue for injuries caused by exposure to asbestos during the ship construction process. Most of these claims were brought against manufacturers and were not brought under section 905(b). Nevertheless, the opinions are instructive for purposes of the *Ozzello* case because all the circuits which considered such cases decided that plaintiffs must meet the *Executive Jet* case for admiralty tort jurisdiction regardless of the grounds for jurisdiction set forth in the complaints. Accordingly, these courts reviewed the records to determine whether the shipbuilder plaintiffs had established a substantial relationship between the circumstances of their injuries and traditional maritime activity.

Under long-established admiralty law, contracts to build ships have not been considered maritime contracts. *See, e.g., People's Ferry Company of Boston v. Beers,* 61 U.S. (20 How.) 393, 15 L.Ed. 961 (1858); *Thames Company v. The Francis McDonald,* 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920). Likewise, torts occurring in the course of shipbuilding have not been considered maritime torts. *See, e.g., Owens–Illinois, Inc. v. United States District Court,* 698 F.2d 967, 971 (9th Cir.1983). Therefore, based on this legal reasoning,[11] the courts concluded that employees engaging in shipbuilding could not maintain maritime tort actions for asbestos-caused injuries whether the injuries took place on land or aboard partially completed ships on navi-

---

**11.** The traditional rule that torts occurring in the course of the construction of new ships are not considered maritime torts was not the sole basis for rejecting these claims. Most of the courts also analyzed the claims by using a four-factor test under which the court considers: (1) the traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; and (4) the causation and nature of the injury suffered. *See, e.g., Myhran v. Johns–Manville Corporation,* 741 F.2d 1119, 1121 (9th Cir.1984). As the Ninth Circuit explained:

Although the traditional distinction between contracts for construction versus contracts for repair of ships that was noted in *Owens–Illinois [v. United States District Court,* 698 F.2d 967 (9th Cir.1983) (*per curiam*)] added sup-

port to the conclusion reached there, that distinction alone cannot be determinative.... the traditional contractual distinction may shed light on the nature of the injured worker's activity and may thus be relevant to the inquiry required by *Executive Jet;* but the inquiry must be broader and must be based upon the work actually performed by the injured worker.... The issue is whether Myhran's tort claims bear a significant relationship to traditional maritime activity—not whether the tort actually occurred during the repair as opposed to the construction of ships. *Id.* at 1121–22. The United States Supreme Court has declined to adopt this four-factor test. *See Sisson v. Ruby,* —— U.S. ——, 110 S.Ct. 2892, 2897–98 n. 4, 111 L.Ed.2d 292 (1990).

gable waters. *See Petersen v. Chesapeake & Ohio Railway Company,* 784 F.2d 732 (6th Cir.1986); *Drake v. Raymark Industries, Inc.,* 772 F.2d 1007 (1st Cir.1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986); *Oman v. Johns–Manville Corporation,* 764 F.2d 224 (4th Cir.) *(en banc) cert. denied sub nom. Oman v. H.K. Porter Company,* 474 U.S. 970, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985); *Woessner v. Johns–Manville Sales Corporation,* 757 F.2d 634 (5th Cir.1985); *Myhran v. Johns–Manville Corporation,* 741 F.2d 1119 (9th Cir.1984); *Harville v. Johns–Manville Products Corporation,* 731 F.2d 775 (11th Cir.1984); *Keene Corporation v. United States,* 700 F.2d 836 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Owens–Illinois, Inc. v. United States District Court,* 698 F.2d 967 (9th Cir.1983).

### c. Fifth Circuit Conflict

Another line of cases arising in the wake of *Executive Jet* and the 1972 amendments addressed the issue of whether an employee injured aboard a ship still under construction could maintain a section 905(b) tort claim against the "vessel." A conflict developed in the Fifth Circuit with some panels ruling that a plaintiff need only satisfy the definitional requirements and the locality test in order to maintain a section 905(b) claim, *see, e.g., Hall v. Hvide Hull No. 3,* 746 F.2d 294 (5th Cir.1984), *cert. denied sub nom. Avondale Shipyards, Inc. v. Rosetti,* 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985), and other panels ruling that a plaintiff must first satisfy the *Executive Jet* test for admiralty tort jurisdiction. *See, e.g., May v. Transworld Drilling Company,* 786 F.2d 1261 (5th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986).

In *Hall v. Hvide Hull No. 3,* 746 F.2d 294 (5th Cir.1984), *cert. denied sub nom. Avondale Shipyards, Inc. v. Rosetti,* 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985), the panel decided that the scope of section 905(b) actions had not been limited by *Executive Jet.* After observing that a "shipbuilder" was an employee explicitly covered by the 1972 amendments to the LHWCA, the court focused on the definition of "vessel." In *Hall,* the shipbuilders had been killed or injured aboard floating hulls which were 70–90% completed. The court ruled that a section 905(b) claim could be maintained against these "vessels" even though they were still under construction, so long as they met the United States Code's general statutory definition of "vessel" which provides that: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. *See also McCarthy v. The Bark Peking,* 716 F.2d 130 (2d Cir.1983), *cert. denied sub nom. South Street Seaport Museum v. McCarthy,* 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984); *Burks v. American River Transportation Company,* 679 F.2d 69 (5th Cir.1982); *Lundy v. Litton Systems, Inc.,* 624 F.2d 590 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). The *Hall* court rejected earlier decisions holding that torts occurring on launched but incomplete vessels lacked maritime flavor. *See Lowe v. Ingalls Shipbuilding, A Division of Litton Systems, Inc.,* 723 F.2d 1173, 1187 (5th Cir.1984); *Hollister v. Luke Construction Company,* 517 F.2d 920, 921 (5th Cir.1975) *(per curiam).* In *Hall,* once vessel status was determined, a finding of maritime jurisdiction immediately followed.

A few months later, the First Circuit rejected *Hall* in *Drake v. Raymark Industries, Inc.,* 772 F.2d 1007 (1st Cir.1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986), a case in which manufacturers of asbestos products asserted section 905(b) claims against a shipowner as a basis for indemnity or contribution. After carefully examining alternative theories about the scope of section 905(b), the legislative history of the section, and the "admiralty traditions of simplicity and practicality," the court concluded that "the scope of § 905(b) is limited to maritime torts.... those which fall within the admiralty juris-

diction or satisfy the tests for the application of admiralty law" found in *Executive Jet. Id.* at 1012. Disagreeing with *Hall*, the First Circuit declined "to hold that jurisdiction under § 905(b) requires satisfaction merely of the definitional elements and the situs requirement." *Id.* at 1018 (footnote omitted). The court explained that allowing a plaintiff to maintain a section 905(b) action without establishing admiralty tort jurisdiction would lead to a "double standard" for maritime tort jurisdiction under which all other maritime tort actions would be subject to the *Executive Jet* requirements, while section 905(b) torts would only have to satisfy the definitional elements of the section in addition to the situs requirement. *Drake*, 772 F.2d at 1018. The court warned that: "Interpreting the scope of § 905(b) jurisdiction to include negligence actions other than maritime torts would federalize torts in an area which currently are [sic] governed by state law." *Id.* at 1019.

The next year another panel of the Fifth Circuit, agreeing with *Drake*, suggested that the *Hall* panel's focus on the statutory definition of "vessel" was misplaced. In *May v. Transworld Drilling Company*, 786 F.2d 1261 (5th Cir.), *cert. denied*, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986), the court stated that:

> Our opinions interpreting the applicability of § 905(b) to injuries that are allegedly caused by the negligence of a vessel under construction, whether on water or on dry land, contain statements that are not fully consistent. The inconsistency has arisen, perhaps in part, because we have not always distinguished jurisdiction from the sufficiency of the plaintiff's evidence to establish a claim under § 905(b). Following prior Fifth Circuit precedent and the recent First Circuit decision in *Drake v. Raymark Industries, Inc.*, [772 F.2d 1007 (1st Cir. 1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation*, 476 U.S. 1126 [106 S.Ct. 1994, 90 L.Ed.2d 675] (1986) ], we here explicitly hold that § 905(b) permits only the assertion of a claim for a maritime tort. Only if a claimant first alleges

facts comprising a maritime tort do we need inquire whether he has established the specific elements of a § 905(b) cause of action: (1) the involvement of a "vessel", (2) the "negligence of the vessel," and (3) other subsidiary issues, such as the identity of the vessel owner.

. . . .

> "Congress did not," we said in *Parker*, [*v. South Louisiana Contractors, Inc.*, 537 F.2d 113 (5th Cir.1976), *cert. denied*, 430 U.S. 906 [97 S.Ct. 1175, 51 L.Ed.2d 582] (1977) ], "intend section 905(b) to create a new or broader cause of action in admiralty." "Taken as a whole," we added, its primary purpose was "to curtail rather than expand the availability of third party actions in admiralty." It preserves an injured worker's pre-existing right, under general maritime law, to recover for third-party negligence, but eliminated his right to bring actions against third parties based on unseaworthiness.

> The test to determine the existence of a cause of action in maritime tort is identical with that applied to determine jurisdiction in admiralty. The Supreme Court, in *Foremost Insurance Company v. Richardson*, held that, as indicated in *Executive Jet*, it is requisite to proof of a maritime tort that there be an injury on navigable waters (the traditional "locality" test) and, in addition, that the alleged wrong bear a significant relationship to traditional maritime activity.

*Id.* at 1264–65 (footnotes omitted).

Just two days before Ozzello's accident, the Fifth Circuit resolved the conflict between the *Hall* and *May* panels in an *en banc* opinion rejecting *Hall*. *See Richendollar v. Diamond M Drilling Company*, 819 F.2d 124 (5th Cir.) (*en banc*), *cert. denied*, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). The full court held that:

> [T]o be cognizable under § 905(b), a tort must occur on or in navigable waters subject, of course, to the special provisions of the Admiralty Extension Act, and there must be the traditional admiralty nexus. As a consequence, we now

reject the suggestion made in *Hall v. Hvide Hull No. 3,* 746 F.2d 294, 302–03 (5th Cir.1984), that the pre-*Executive Jet/Foremost Insurance* test for a maritime tort was codified in § 905(b) by the 1972 amendments in the Longshore and Harbor Workers' Act. Further, we reject the use of the statutory definition of vessel in the LHWCA as the basis for the definition of vessel under § 905(b), as was done in *Lundy v. Litton Systems, Inc.,* 624 F.2d 590 (5th Cir.1980), *cert. denied,* 450 U.S. 913 [101 S.Ct. 1353, 67 L.Ed.2d 337] (1981). . . .

*Id.* at 125–26. *See also Molett v. Penrod Drilling Company,* 872 F.2d 1221, 1224 (5th Cir.1989) (*per curiam* ). The *Richendollar* court reiterated that "in enacting § 905(b), Congress did not 'create a new or broader cause of action in admiralty,' and that '[t]aken as a whole, the manifest purpose of section 905(b) is to curtail, rather than expand the availability of third party actions in admiralty.' " *Id.* at 126 (quoting *Parker v. South Louisiana Contractors, Inc.,* 537 F.2d 113, 117 (5th Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977)).

As the plaintiffs in this case have pointed out, these legal developments raise a conceptual difficulty.[12] A shipbuilder such as Ozzello is an employee engaged in "maritime employment," according to the LHWCA definition. Yet, under most circumstances, a shipbuilder will not be able to establish that any activity carried out in the course of his employment bears a sub-

stantial nexus to traditional maritime activity and, consequently, will not be able to maintain a negligence claim against a "vessel" under section 905(b).

The Federal Circuit has attempted to explain this seeming discrepancy by saying that:

[I]n our view . . . section 905(b) is not coextensive in its coverage of employees with those for whom the employer must obtain coverage under section 903 [of Title 33 of the United States Code]. Under that law, those engaged in shipbuilding are covered and must be insured. However, eligibility for worker's compensation under section 903 is not the same as, and may be broader than, general maritime jurisdiction.

*Lopez v. A.C. & S., Inc.,* 858 F.2d 712, 720 (Fed.Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989). *See also Drake v. Raymark Industries, Inc.,* 772 F.2d 1007, 1018 (1st Cir.1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986).

**d. The Ozzellos' Section 905(b) Claims**

■ The Seventh Circuit has not addressed the issue of whether an injured employee must establish admiralty jurisdiction in order to maintain a section 905(b) claim under the LHWCA, but the court sees no reason why this circuit would not adopt the position of the First and Fifth

---

12. In support of their contention that a section 905(b) plaintiff need not establish a substantial nexus between the accident and traditional maritime activity, the Ozzellos rely heavily throughout their pretrial submissions on language in the Supreme Court's opinion in *Director, OWCP v. Perini North River Associates,* 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983). In *Perini,* the Court stated that an employee, as defined by the LHWCA, need not establish that "his employment possessed a direct (or substantial) relation to navigation or commerce in order to be covered." *Id.* at 318–19, 103 S.Ct. at 647–48. However, *Perini* involved a claim for workers' compensation benefits made pursuant to section 905(a)—not a claim for tort damages made pursuant to section 905(b). Faced with an argument similar to the one raised by the Ozzellos, the First Circuit explained that:

We discern no basis for this construction of the jurisdictional range of § 905(b). *Perini* was concerned solely with *compensation,* not with maritime tort jurisdiction, and these two boundaries have for a long time been quite distinct, . . . . We have uncovered no legislative history even intimating that Congress wished to incorporate into § 905(b) the then-current boundaries of maritime tort jurisdiction, and place them beyond the traditional common law powers of the admiralty courts. *Drake v. Raymark Industries, Inc.,* 772 F.2d 1007, 1018 (1st Cir.1985), *cert. denied sub nom. Raymark Industries, Inc. v. Bath Iron Works Corporation,* 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986).

Circuits[13] limiting section 905(b) claims to maritime torts. No other circuit has rejected this position and, in past rulings, the Seventh Circuit has not taken an expansive view of admiralty jurisdiction. *See, e.g., In re Complaint of Sisson,* 867 F.2d 341 (7th Cir.1989), *rev'd sub nom. Sisson v. Ruby,* — U.S. —, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Therefore, this court will adhere to the rulings of the First and Fifth Circuits. Having determined that the Ozzellos have met the situs and status requirements for a section 905(b) claim, the court will now examine whether they have also established admiralty jurisdiction.

In arguing the jurisdictional issue, the parties have focused on the configuration of the ship rather than on the tort's relationship to traditional maritime activity. The parties stipulated that, at the time of William Ozzello's injury, the MCM–01 was still under construction and was approximately 80–90% complete. *See* Amended Final Pretrial Report at (a), ¶ 6. The MCM–01 was afloat upon navigable waters and had actually been navigated during propulsion trials held on June 3, 1987. *See Id.;* Affidavit of Calvin Matzke at ¶ 5. However, "after *Richendollar,* the 'configuration of the watercraft is of secondary importance.' Maritime jurisdiction can only be established by satisfying *Executive Jet's* two-part situs and nexus requirement." *Molett v. Penrod Drilling Company,* 872 F.2d 1221, 1225 (5th Cir.) (*per curiam*), *cert. denied sub nom. Columbus–McKinnon, Inc. v. Gearench, Inc.,* — U.S. —, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989) (quoting *Richendollar v. Diamond M Drilling Company, Inc.,* 819 F.2d 124, 127 (5th Cir.) (*en banc*), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987)).

Recently, in *Sisson v. Ruby,* — U.S. —, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), a tort case in which fire destroyed a moored yacht then damaged a marina and neighboring boats, the United States Supreme Court reiterated that "the party seeking to invoke maritime jurisdiction must show a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Id.* 110 S.Ct. at 2897. As a first step, a court must "define the relevant activity," ... "not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Id.* Then, the court is to determine whether this activity "has a substantial relationship to a 'traditional maritime activity' within the meaning of *Executive Jet* and *Foremost.*" *Id.* (footnote omitted). The Court declined to adopt any of the multi-factor tests for identifying "traditional maritime activity" which various circuits had devised. *See Id.* at 2897–98 n. 4. Instead, the Court explained that:

> We believe that, at least in cases in which all of the relevant entities are engaged in similar types of activity, ... the formula initially suggested by *Executive Jet* and more fully refined in *Foremost* and in this case provides appropriate and sufficient guidance to the federal courts.

*Id.* Therefore, guided by the factors considered by the Court in *Executive Jet, Foremost* and *Sisson,* this court will proceed to determine whether William Ozzello's injury occurred in furtherance of an activity bearing a substantial relationship to a traditional maritime activity. *See Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 219, 106 S.Ct. 2485, 2492, 91 L.Ed.2d 174 (1986).

First, the general conduct from which Ozzello's injury arose was shipbuilding. Defendant PBI and its employees were in the process of completing the MCM–01 and Ozzello himself was aboard to test and inspect equipment which had been fabricated by his employer, subcontractor A.C. Hoyle. As explained in Part III(B)(2)(b), above, shipbuilding has traditionally not been considered a maritime activity for purposes of asserting admiralty tort jurisdiction. *See Lowe v. Ingalls Shipbuilding, a Division of Litton Systems, Inc.,* 723 F.2d 1173, 1187 (5th Cir.1984); *Owens–Illinois, Inc. v. United States District Court,* 698

---

**13.** The Third Circuit has indicated that it would follow the First and Fifth Circuits. *See Eagle-Picher Industries, Inc. v. United States,* 846 F.2d

888, 890 n. 2 (3d Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988).

F.2d 967, 971 (9th Cir.1983). Nevertheless, resting a jurisdictional decision on this ground alone has been criticized,[14] so the court will go on to examine other circumstances.

In *Executive Jet, Foremost* and *Sisson* (none of which involved shipbuilding), the Court said that the following factors weigh in favor of exercising maritime tort jurisdiction:

—when the accident occurs in the course of maritime service;

—when the accident occurs in the course of navigation;

—when the accident occurs in the course of promoting maritime commerce or presents a hazard to maritime commerce;

—when the conduct gives rise to the need for the application of admiralty law, particularly the uniform "rules of the road" governing navigation.

*See Sisson v. Ruby,* — U.S. —, 110 S.Ct. 2892, 2898, 111 L.Ed.2d 292 (1990); *Foremost Insurance Company v. Richardson,* 457 U.S. 668, 672–77, 102 S.Ct. 2654, 2656–59, 73 L.Ed.2d 300 (1982); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 253–74, 93 S.Ct. 493, 497–507, 34 L.Ed.2d 454 (1972).

No one of these factors is dispositive. In *Sisson,* for example, the Court declined to adopt the rule suggested by Justice Scalia in his concurrence that any tort taking place aboard a vessel would come under admiralty jurisdiction.[15] *See Sisson,* 110 S.Ct. at 2896–97 n. 2. Likewise, the Court has emphasized that there is no require-ment that the activity involved be exclusively commercial, *see Foremost,* 457 U.S. at 674, 102 S.Ct. at 2658, or that the vessel be in navigation. *See Sisson,* 110 S.Ct. at 2898.

Applying these guidelines to the *Ozzello* case, the court finds that only the location of Ozzello's injury weighs in favor of exercising admiralty jurisdiction. William Ozzello sprained his ankle aboard the MCM-01, a ship under construction upon the navigable waters of Lake Michigan. However, the involvement of the MCM-01 was tangential. The ship was not in navigation at the time of the injury and the plaintiffs presented no evidence that the general conduct involved had any effect on maritime commerce. Moreover, there is no evidence that William Ozzello or any of the PBI personnel were performing the work of seamen or that the hazard (a hose nozzle) is a piece of equipment peculiar to ships or navigation.

Under these circumstances, the resolution of the Ozzellos' claims does not require the special expertise of a court in admiralty. The fundamental interests giving rise to the need to apply admiralty law [16] are the protection of maritime commerce and the need for uniform rules of navigation. *See Sisson,* 110 S.Ct. at 2898; *Foremost,* 457 U.S. at 676, 102 S.Ct. at 2659. Accordingly, in *Foremost* the Court decided that it should exercise admiralty jurisdiction because uniform rules of navigation should apply to pleasure boats as well as to vessels directly involved in maritime commerce. And, in *Sisson,* the Court ruled

---

**14.** *See, e.g., Myhran v. Johns–Manville Corporation,* 741 F.2d 1119, 1121–22 (9th Cir.1984). *See also Sisson v. Ruby,* — U.S. —, 110 S.Ct. 2892, 2900–2901, 111 L.Ed.2d 292 (1990) (Scalia, J., concurring).

**15.** Even under Justice Scalia's test, the reach of admiralty jurisdiction would depend upon whether the craft involved had attained vessel status. *See Sisson,* 110 S.Ct. at 2902 n. 5 (Scalia, J., concurring).

**16.** As described by the *Executive Jet* Court:
The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.
*Executive Jet Aviation, Inc.,* 409 U.S. at 269–70, 93 S.Ct. at 505.

that admiralty law should govern the liability of a moored pleasure yacht for a fire that spread to a marina because storage and maintenance of a vessel is substantially related to traditional maritime activity.

By contrast, in the instant case the court perceives no federal interest in uniformity of decision requiring the application of federal substantive law. The conduct which forms the basis for the Ozzellos' claims is more closely related to land-based negligence than to negligence taking place in maritime commerce or navigation. Furthermore, the legal issues are identical to those presented in countless other stumble and fall cases that are resolved by local tort law. The *Executive Jet* Court concluded that in a situation "which is only fortuitously and incidentally connected to navigable waters and which bears no relationship to traditional maritime activity," the state can "plainly exercise jurisdiction over the suit," and can "plainly apply familiar concepts of [state] tort law without any effect on maritime endeavors." *Executive Jet Aviation, Inc.*, 409 U.S. at 273, 93 S.Ct. at 507 (footnotes omitted). Likewise, federalism concerns dictate that this case be litigated under state law.

For these reasons, the court concludes that there is no substantial relationship between Ozzello's injury and traditional maritime activity. Consequently, the plaintiffs have not established admiralty tort jurisdiction over the subject matter of their claims and they cannot maintain their causes of action under section 905(b) of the Longshore and Harbor Workers' Compensation Act.

### C. LIABILITY

 Having ruled that the Ozzellos' causes of action do not arise under federal maritime law, the court must determine whether Peterson Builders, Inc. is liable to them under Wisconsin negligence law. Under Wisconsin's Safe Place Statute, an employer or owner of a place of employment, such as PBI, must do everything reasonably necessary to protect the health and safety of frequenters [17] such as William Ozzello. *See* Wis.Stat. §§ 101.11(1) & (2)(a).

The court's finding that defendant Peterson Builders, Inc. is liable to the plaintiffs rests upon the court's view that plaintiff William Ozzello offered substantially credible testimony at trial. Ozzello stated positively that, after boarding the MCM–01 on the morning of June 18, 1987, he proceeded to climb up onto a fixture to check equipment for leaks. At the time of his ascent, he noticed no hose or other obstruction beneath his feet. Twenty minutes later, when he descended from the equipment, his foot landed upon a hose nozzle causing him to fall and injure his left ankle.

No other person aboard the MCM–01 witnessed this accident and, although PBI was aware that Ozzello had been injured, the company conducted no investigation. Consequently, the recollections of its fact witnesses were dim and did not have a solid factual basis. In maintaining the workplace, PBI employees were supposed to observe the safety practice of keeping walkways and work areas free of obstructions and hazards. PBI conceded that any hose aboard the MCM–01 would have been in its custody and control and that the area in which Ozzello was working and in which the injury took place was also under its supervision and control. Because it could only have been PBI employees who deposited the hose on the deck, the company had constructive notice of this unsafe condition. *See May v. Skelley Oil Company*, 83 Wis.2d 30, 37 n. 7, 264 N.W.2d 574, 577 n. 7 (1978). Thus, by the affirmative act of leaving the hose where it could present a hazard, PBI, through its employees, breached its duty to provide a safe workplace for Ozzello.[18] Consequently, the

---

17. As an employee of A.C. Hoyle, a subcontractor of PBI, William Ozzello meets the Wisconsin Safe Place Statute's definition of "frequenter." *See* Wis.Stat. § 101.01(2)(d). *See also Barth v. Downey Company*, 71 Wis.2d 775, 778–79, 239 N.W.2d 92, 93–94 (1976).

18. Ozzello claims to have seen two PBI employees remove the hose shortly after the accident; but, after working two months aboard the ship, he was unable to identify the employees. For lack of any corroborating evidence, the court

court assigned sixty percent of the causal negligence to defendant PBI.

In deciding whether Ozzello was also a substantial cause of his own injury, the court was persuaded by the defendant's ship safety expert, John Barto, that Ozzello could have seen the hose had he looked before beginning his descent. Lying on the deck, this hose and its nozzle were open and obvious. However, this fact alone does not absolve PBI of liability. Obviousness of the hazard is merely a factor to consider in assessing the degree of Ozzello's contributory negligence. *See* Wisconsin Jury Instructions—Civil 1902. The court also considered that, when a workman is preoccupied with his work, the degree of care expected of him is minimized in respect to a particular and immediate hazard. *See Suhaysik v. Milwaukee Cheese Company,* 132 Wis.2d 289, 295–96, 392 N.W.2d 98, 100–02 (1986). Considering these circumstances in view of the applicable law, the court assigned forty percent of the causal negligence to William Ozzello.

## D. DAMAGES

■ Prior to trial, the parties stipulated to William Ozzello's past wage loss ($4,301.44) and to part of his past medical bills and related travel expenses ($5,227.27). *See* Amended Final Pretrial Report at (a), ¶¶ 10 & 11. At trial, the plaintiff submitted additional bills for medical treatment in the amount of $1,966.00. *See* Trial Exhibit 42. These additional bills were unchallenged by the defendant. Therefore, the total amounts of past wage loss and past medical bills claimed by the plaintiffs have been awarded to William Ozzello.

The largest factor in the damage calculus is the award of $29,250.00 for William Ozzello's past pain and suffering and $108,000.00 for his future pain and suffering. In arriving at these figures, the court con-

sidered that William Ozzello was just three days short of his fifty-fifth birthday on the date of his injury and that at the time of trial he had a remaining life expectancy of 19.9 years. Ozzello, his wife, and his treating physician all testified about the discomfort and physical limitations Ozzello has experienced since the date of his injury. Treating physician, Donald Jacobs, M.D., believes that this pain will likely plague Ozzello for the remainder of his life. The plaintiffs testified that William Ozzello has been wearing a brace and that, while before the accident he devoted most of his leisure time to outdoor activities such as hunting and fishing, his present ability to engage in many of these outdoor pursuits has been curtailed.[19] In addition, Ozzello's employment duties have been changed from inspecting equipment aboard ships to custodial and office work in order to accommodate his injury. Nevertheless, Ozzello's wages and benefits have not been reduced and the court did not find that he will sustain any future wage loss.

As for the loss of society claim of Marlene Ozzello, the court considered the plaintiffs' testimony that William Ozzello now has a limited ability to help with yard work and house maintenance chores. At the same time, Mrs. Ozzello has had increased duties of care for her husband. She also testified that they are no longer able to participate fully in some social activities such as dancing; but, because William Ozzello spends most of his work and leisure time away from home, the court finds this factor to be of minor significance. For these reasons, the court has awarded Marlene Ozzello $5,000.00.

Taking all these circumstances into consideration, the court arrived at its total award of $153,744.71. Under Wisconsin's principles of comparative negligence, this award must be reduced by forty percent to reflect William Ozzello's degree of contributory negligence. As a result, the plain-

---

declined to make a finding that this event occurred.

The type and configuration of the hose was also hotly disputed by the parties. But, these details are not material, so the court found it unnecessary to resolve the conflicting versions.

**19.** According to the Mayo Clinic medical records, William Ozzello was still able to engage in the sport of snowshoeing during the winter following his injury. *See* Trial Exhibit 31 at entry of April 8, 1988.

tiffs will receive $92,246.83. Although this is considerably less than the $560,000.00 sought in their prayer for relief, the court believes that the award is adequate compensation under the circumstances and is generous compared to awards in similar cases. *See, e.g., Callen v. OULU O/Y,* 711 F.Supp. 244 (E.D.Pa.1989) (longshoreman plaintiff who was sixty-three years old at the time of trial and had experienced and would experience pain, discomfort and diminution in the quality of life due to ankle sprain injury awarded $60,000.00 for pain and suffering), *aff'd,* 897 F.2d 520 (3d Cir. 1990) (mem.), *petition for cert. filed,* 58 U.S.L.W. 3787 (U.S. May 29, 1990) (No. 89–1868); *Gansch v. Nekoosa Papers, Inc.,* 152 Wis.2d 666, 449 N.W.2d 307 (Ct.App. 1989) ($79,200.00 awarded by jury to plaintiff with crushed foot who had forty-eight years to live with pain and limited ability to work and enjoy recreational pursuits), *petition for review granted,* — Wis.2d —, 451 N.W.2d 297 (1990).

### ORDER

Based on the court's Findings of Fact and Conclusions of Law made following a bench trial, the court ORDERS that judgment be entered in favor of plaintiffs William Ozzello and Marlene Ozzello and against defendant Peterson Builders, Inc. on the plaintiffs' cause of action under the Wisconsin Safe Place Statute. *See* Wis. Stat. § 101.11. Defendant Peterson Builders, Inc. is liable to the plaintiffs for the following amounts of compensatory damages:

| | |
|---|---|
| Past medical, hospital and related travel expenses | $ 7,193.27 |
| Past wage loss | $ 4,301.44 |
| Past pain and suffering | $ 29,250.00 |
| Future pain and suffering | $108,000.00 |
| Loss of consortium | $ 5,000.00 |
| TOTAL: | $153,744.71 |

IT IS FURTHER ORDERED that, under Wisconsin's doctrine of comparative negligence, the plaintiffs' total award shall be reduced by forty percent to reflect the percentage of the total causal negligence attributed to plaintiff William Ozzello. This results in an award to the plaintiffs of $92,246.83.

IT IS FURTHER ORDERED that the plaintiffs' causes of action under section 905(b) of the Longshore and Harbor Workers' Compensation Act are dismissed. *See* 33 U.S.C. § 905(b).

IT IS FURTHER ORDERED that this action is dismissed upon its merits.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 58, the Clerk of Court shall enter final judgment as a separate document. This judgment shall provide that:

This action came on for trial before the Court, Honorable Thomas J. Curran, District Judge, presiding, and the issues having been duly tried and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED that the plaintiffs William Ozzello and Marlene Ozzello recover of the defendant Peterson Builders, Inc. the sum of $92,246.83, with interest from the date of entry of judgment thereon at the statutory rate, and their costs of action.

IT IS FURTHER ORDERED AND ADJUDGED that this action is dismissed upon its merits.

Done and Ordered.